# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION |
| VERSUS | |
| JESSE SLOANE | NO.: 19-00037-BAJ-RLB |

## RULING AND ORDER

Before the Court is the **Motion to Suppress (Doc. 19)** filed by Defendant Jesse Sloane. The Government filed an opposition. (Doc. 23). The Court conducted an evidentiary hearing. Both parties subsequently filed post-hearing briefs. (Doc. 29, 30). For the reasons stated herein, the motion is **DENIED**.

## I. BACKGROUND

In January of 2018, William Sellers, an investigator with the Louisiana State Police Special Victims' Unit, was searching for individuals who were downloading and sharing child pornography on the BitTorrent network.[1] (Doc. 27 at p. 24). Sellers utilized a program called "Torrential Downpour," which allows investigating officers to conduct single source downloads.[2] (*Id.* at p. 25).

On January 21, 2018, Sellers downloaded approximately seventy images depicting child pornography from a single IP address. (Doc. 27 at p. 26, 44, 64). Sellers then consulted a public website, the American Registry for Internet Numbers,

---

[1] BitTorrent is a file sharing program freely available on the internet. It allows individuals to share and download movie, music, and image files from one another. (Doc. 27 at p. 24).

[2] A regular BitTorrent user typically downloads a file from multiple sources because this method increases the downloading speed. (*Id.* at p. 25).

which matches IP addresses with service providers. (*Id.*). Sellers determined that the IP address in question was registered to Cox Communications. (*Id.* at p. 27). Sellers then sent a subpoena to Cox requesting the subscriber information for the time and date the IP address accessed the images. Cox informed Sellers that the IP address belonged to Defendant and provided him with Defendant's home address. (*Id.* at p. 28).

Sellers testified that he conducted surveillance on the residence five or six times, although he could not remember on what days and at what times. Sellers did not conduct surveillance on January 21, the day the images were downloaded. (*Id.* at p. 47). During the surveillance, Sellers observed a pickup truck at the residence that he determined was registered to Defendant. (*Id.* at p. 28). Sellers attempted to discern whether any other individuals lived with Defendant, but he never observed anyone other than Defendant going to or coming from the residence. (*Id.*)

On March 13, 2018, Sellers requested a search warrant for the residence. On March 14, 2018, at approximately 5:00 A.M., a contingent of ten to fifteen state and local law enforcement officers congregated at a staging area near the residence to prepare to execute the search warrant. (*Id.* at p. 33). Trooper Malcolm Brown, who also worked for the Louisiana State Police, was shown Defendant's driver's license photograph. Afterwards, Brown parked his own unmarked vehicle down the street from the residence for surveillance purposes. (*Id.* at pp. 30-31).

While the officers reviewed the operations plan in the staging area, Brown alerted Sellers via radio that Defendant had exited his residence, entered his vehicle, and was preparing to leave the area. (Doc. 27 at p. 33). Sellers directed Brown to

follow Defendant and informed him that other officers would arrive shortly. (*Id.* at p. 34). Sometime before 6:30 A.M., Brown stopped Defendant's vehicle less than half a mile from the residence and directed Defendant to park in an adjacent lot. (*Id.* at p. 37).

Sellers eventually arrived at the scene of the traffic stop. (Doc. 27 at p. 36). He informed Defendant that law enforcement officers were executing a search warrant of his home. (*Id.* at p. 37, 55). He also informed Defendant that he was not under arrest but that "he'd like [Defendant] to return with him." Sellers did not tell Defendant that he was required to return with him. (*Id.* at p. 37). Sellers did not recall telling Defendant that he had to leave his phone in the vehicle. (*Id.* at p. 56). Defendant was not handcuffed when Sellers spoke with him. (*Id.* at p. 37).

Sellers testified that Defendant agreed to accompany the officers back to the residence. (Doc. 27 at p. 37). Sellers alleges that he informed Defendant that the police officers would secure Defendant's vehicle and that the police would give Defendant a ride back to the residence. (*Id.*). Sellers did not direct the police officers to handcuff Defendant on the way back to the residence.

Upon reaching the residence, Defendant informed Sellers that his brother, James Nice, was living with him. (*Id.* at p. 38). Sellers testified that the officers had not known this before executing the warrant. (*Id.*) The officers then secured the residence and accompanied Defendant inside for an interview. (*Id.*) Defendant, Sellers, and one other officer entered a storage room in the residence for the interview. Defendant was not restrained, not in handcuffs, and was informed that he was still not under arrest. (*Id.* at p. 39). The door to the storage room was also not

closed or barricaded to prevent exit. (*Id.*) Defendant was advised of his Miranda rights and signed a waiver of rights at 6:51 A.M. (Exhibit 1). During the interview, Defendant admitted that he possessed child pornography. Defendant now seeks to suppress this admission.

## II. DISCUSSION

Defendant argues that the officers illegally stopped him; thus, under the Fourth Amendment, the confession obtained at Defendant's residence constitutes "fruit of the poisonous tree." *U.S. v. Tovar*, 719 F.3d 376, 387 (5th Cir. 2013) (holding that verbal statements derived from an unauthorized seizure constitute "fruit of the poisonous tree"). In the case of a warrantless seizure, the Government bears the burden of proving, by a preponderance of evidence, that the seizure was constitutional.

### A. Did the Stop Satisfy the *Terry v. Ohio* Standard?

In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court articulated a narrow exception to the warrant requirement for seizures. Under *Terry*, a stop for investigative purposes is reasonable under the Fourth Amendment if (1) the stop was justified at its inception, and (2) the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop in the first place. *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005).

### *1. Was the Stop Justified at its Inception?*

A *Terry* stop is justified at its inception if the officer has reasonable suspicion that an individual has committed a crime. *United States v. Monsivais*, 848 F.3d 353, 357 (5th Cir. 2017). "Reasonable suspicion exists when the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the. . . seizure." *Lopez-Moreno*, 420 F.3d at 430 (5th Cir. 2005).

Defendant asserts that fifty-three days elapsed between the date Defendant's IP address was used to download child pornography and when the search warrant was executed. (Doc. 29 at p. 4). Defendant argues that there is no evidence that the IP address was used to access additional child pornography during the fifty-three day period. (*Id.*) Defendant appears to be arguing that the information which formed the basis of Seller's reasonable suspicion had become stale by the time Defendant's vehicle was stopped. *See U.S. v. Gonzalez*, 190 F.3d 668, 672 (5th Cir. 1999) (holding that whether a tip may form the basis of reasonable suspicion depends in part on whether the information has become stale, which is a fact specific inquiry). The Court disagrees. Sellers knew with certainty that an IP address, at the time it was used to access child pornography, was registered to Defendant. There no indication that this evidence had been cast into doubt at any point between when the IP address was used to download child pornography and when Sellers ordered the traffic stop. In other words, the crime had already been committed, and the passage of time would have no bearing on the matter. Accordingly, Sellers still maintained reasonable suspicion that Defendant had committed a crime.

Defendant further argues that upon obtaining the IP address, Sellers did not attempt to limit potential suspects and did not seek to determine who, other than Defendant, may have had access to the computer linked to the IP address. (Doc. 29 at p. 4). This argument fails. Sellers knew that the IP address was registered to Defendant. (Doc. 27 at p. 28). Sellers conducted surveillance on Defendant's residence at least five or six times and did not observe anyone else going into or coming from the residence. (Doc. 27 at p. 48). Although it was eventually discovered that Nice also resided at Defendant's home, Sellers had no reason to know this. Thus, it was reasonable for Sellers to conclude that Defendant, and only Defendant, used the computer that accessed the child pornography. Accordingly, Sellers had developed sufficient reasonable suspicion to justify the stop of Defendant's vehicle.[3]

### 2. *Were Officers' Actions Reasonably Related to the Circumstances that Justified the Stop?*

The second prong of *Terry* provides that a detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. *United States v. Brigham*, 382 F.3d 500, 507 (5th Cir.2004). If additional reasonable suspicion arises during the course of the stop, the detention may continue until such suspicion has been dispelled or confirmed. *Lopez-Moreno*, 420 F.3d at 431. Neither party specifically addressed the second prong of *Terry* at oral argument or in the briefs.

---

[3] The Court notes that although Sellers did not conduct the traffic stop himself, he provided the other officers with the justification to stop Defendant. The "collective knowledge doctrine' provides that an investigatory stop of an individual can be based on another officer's reasonable suspicion that the individual has committed a crime. *U.S. v. Ibarra-Sanchez*, 199 F.3d 753, 759 (5th Cir. 1999) (citing *U.S. v. Hensley*, 469 U.S. 221, 229-230 (1985)). Thus, the other officers properly stopped Defendant at Sellers' direction.

6

As noted, the officers executed the stop to investigate their reasonable suspicion that Defendant had accessed child pornography. There is no indication that while Sellers spoke with Defendant in the parking lot, Defendant said anything to confirm Seller's suspicion. Defendant was then taken back to his residence where he later confessed to possessing child pornography. Approximately twenty-five minutes elapsed between the initial stop and Defendant's waiver of rights. (Doc. 29 at p. 7). The act of transporting Defendant back to his home for an interview may have extended well beyond what was necessary to effectuate the purpose of the stop. Ultimately, however, the Court makes no judgment on this issue because it concludes below that Defendant voluntarily agreed to return to the residence, as indicated in Sellers' testimony. (Doc. 27 at p. 37) ("He [Defendant] agreed to come back with us.")

### B. Did Defendant Voluntarily Return to the Residence?

Defendant contends that he continued to be seized as he was driven by police officers to his residence. (Doc. 29 at p. 6). In contrast, the Government argues that Defendant voluntarily agreed to accompany officers back to the residence for the execution of the search warrant and, therefore, appears to argue that Defendant was no longer seized for Fourth Amendment purposes.

The Government has the burden of proving that an encounter with law enforcement was consensual rather than coercive. *United States v. Mendenhall*, 446 U.S. 544, 557 (1980). An individual has been seized for Fourth Amendment purposes if "in view of all of the circumstances surrounding the incident," a reasonable person would have believed that he was not free to leave. *United States v. Mask*, 330 F.3d 330, 337 (5th Cir. 2003). As long as cooperation is "voluntary and not the product of

police coercion," an individual is not seized. *U.S. v. Smith*, 649 F.2d 305, 308 (5th Cir. 1981). The Fifth Circuit has considered several factors in determining whether an individual was seized: (1) the threatening presence of several officers, (2) the display of a weapon by an officer, (3) the physical touching of the person, and (4) the use of language or tone of voice indicating that compliance with an officer's request might be compelled. *Mask*, 330 F.3d at 337.

The Court concludes that the Government has proven by a preponderance of the evidence that Defendant voluntarily returned to the residence. It is true that at least five or six officers were present in the parking lot when Defendant was stopped. (Doc. 27 at p. 54). However, Defendant only spoke with "a couple of officers," while the others were ten to fifteen feet away, which reduced the coercive nature of the encounter. (*Id.*) Moreover, while Sellers never explicitly told Defendant that he was free to leave, he did inform Defendant that he was not under arrest. (*Id.* at p. 55). Sellers asked Defendant to return to the residence to discuss the search warrant, he did not demand that Defendant do so. (*Id.* at p. 37). Defendant was not handcuffed or restrained in any way. (*Id.*) Defendant's car keys and cell phone were not seized (*Id.* at p. 57). At no time did Sellers or any of the other officers draw their weapons or brandish them at Defendant. None of the evidence suggests that the officers ever physically touched Defendant. Finally, no evidence was presented to show that officers blocked Defendant's path to leave. Accordingly, the Court concludes that after Defendant's vehicle was initially stopped, he voluntarily agreed to return to his residence and was no longer seized for purposes of the Fourth Amendment.

The Court further concludes that Defendant's transportation to the residence and subsequent interview also was not a seizure. *See Mendenhall*, 446 U.S. at 554 ("a consensual encounter between a police officer and a citizen can be transformed into a seizure or detention"). It is true that Defendant was transported to the residence in a police vehicle while his own vehicle was secured by the police. However, it would only have been a brief journey, as the site of the *Terry* stop was less than half a mile from Defendant's residence. (Doc. 27 at p. 37). It is unclear whether Defendant was handcuffed in the police vehicle, but Sellers was clear that he did not direct the officers to handcuff him. (*Id.*) *See Carroll v. Ellington*, 800 F.3d 154, 170 (5th Cir. 2015) (holding that restraint on freedom of movement increases the likelihood that an individual is seized). Defendant then accompanied the officers into his home and was interviewed in a bedroom that was being used as a storage room. (*Id.* at p. 58) He was not handcuffed during the interview. (*Id.*) The exit was not obstructed in anyway. (*Id.*) He was only interviewed by two police officers. Defendant again was told that he was not under arrest. (*Id.*) Accordingly, the Court concludes that Defendant's encounter with police continued to be consensual, at least up until the point he was advised of his *Miranda* rights.

### C. Attenuation Doctrine

The Court further concludes that even if Defendant was seized for longer than permitted by *Terry*, Defendant's confession was sufficiently attenuated from the illegal seizure to allow the admission of his confession. The Supreme Court has held that where a confession is sufficiently attenuated from a preceding Fourth Amendment violation, the confession is admissible. *Brown v. Illinois*, 422 U.S. 590

9

(1975). The Supreme Court has identified four factors that must be considered in the attenuation analysis: (1) the provision of *Miranda* warnings; (2) the temporal proximity between the unlawful arrest and the challenged statements; (3) intervening circumstances; and (4) the purpose and flagrancy of the official misconduct. *Id.*

The Court concludes that these factors on balance weigh slightly in favor of the Government. First, it is undisputed that Defendant was provided *Miranda* warnings and waived his *Miranda* rights before making his admission.

The temporal proximity between the unlawful arrest and the challenged statements does not weigh in favor of either party. It is true that less than twenty-five minutes elapsed between when Defendant was stopped and when he signed the waiver of rights. However, the Fifth Circuit has held that where relatively little time has elapsed, the determination generally turns on the conditions of custody; a shorter time lapse may be permissible if the circumstances of detention are less severe. *United States v. Mendez*, 885 F.3d 899, 912 (5th Cir. 2018). In the instant case, Defendant was not handcuffed while he was interviewed. He was interviewed in his own home, rather than a police station *See Mendez*, 885 F.3d at 913) (holding that that the temporal proximity factor weighs against attenuation where Defendant is placed in a police vehicle and interrogated at the police station.). The Court further notes that even if the temporal proximity factors did weigh slightly in favor of Defendant, it would not be outcome determinative. *Id.* at 912 ("Temporal proximity is not dispositive and is typically the least determinative factor involved.").

The Court also concludes that no intervening circumstances were present during the encounter, thus this factor weighs in favor of neither party. Intervening circumstances weigh in favor of the Government when evidence independent from the alleged illegal arrest establishes probable cause to arrest the Defendant. *United States v. Cherry*, 794 F.2d 201, 206 (5th Cir. 1986). The Government contends that the officers found numerous images and videos depicting child pornography on Defendant's electronic devices. (Doc. 23 at p. 5). However, the Government did not present such evidence at the evidentiary hearing. Accordingly, it is unclear from the record whether the officers had independent probable cause to arrest Defendant prior to his confession.

Finally, the fourth factor, the purpose and flagrancy of the misconduct, weighs in favor of the Government. As the Court has already concluded, officers initially had ample reasonable suspicion to stop Defendant's vehicle. The Court further concludes that any further misconduct on the officers' part amounted to, at most, negligence. *Mendez*, 885 F.3d at 912 (holding that in order for a violation to be purposeful or flagrant, it must be more than negligent). As noted, the officers did not at any point order Defendant to accompany them back to his home, tell Defendant that he was under arrest, or restrain him in any way. There is no evidence to suggest that the officers had an improper purpose or committed conscious wrongdoing by asking Defendant to return to the residence. *Id.* at 913 (holding that an improper purpose or conscious wrongdoing is necessary to find flagrancy of misconduct).

III.   CONCLUSION

Accordingly,

**IT IS ORDERED** that the **Motion to Suppress (Doc. 19)** is DENIED.

Baton Rouge, Louisiana, this 13th day of August, 2019.

_____
**JUDGE BRIAN A. JACKSON
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA**